UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| B.W., through his guardian BRENDA WANN, | Case No. 1:18-CV-00184-CWD |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER (DKT 4)** |
| VALLIVUE SCHOOL DISTRICT NO. 139, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court is a motion for a preliminary injunction filed by Plaintiff B.W., a minor, by and through his mother, Brenda Wann, against Defendant Vallivue School District No. 139. (Dkt. 4.) The parties filed responsive briefing, other materials, and sur-reply documents. The Court conducted a hearing on May 21, 2018, at which the parties appeared and presented their arguments. For the reasons that follow, the Court will deny the motion for preliminary injunction.

# PROCEDURAL BACKGROUND

Plaintiff, B.W., seeks a preliminary injunction preventing the District from enforcing his expulsion from Ridgevue High School (Ridgevue), which is within Vallivue School District No. 139 (District). On February 28, 2018, the District expelled Plaintiff for one year based on his role in a bullying and harassment incident that took place on school grounds on February 9, 2018.

On April 26, 2018, Plaintiff filed a complaint against the District asserting three claims. (Dkt. 1.) First, he claims under 42 U.S.C. Section 1983 that the District violated his rights to procedural due process under the Fourteenth Amendment to the United States Constitution by failing to provide a fair pre-deprivation hearing. Specifically, he contends that the District admitted hearsay by introducing a discipline report at the meeting—without producing the witnesses whose statements helped form the basis for the report. Second, Plaintiff alleges Idaho Code Section 33-205 violates the Fourteenth Amendment and the Supremacy Clause, and seeks a declaratory judgment to that effect. Third, Plaintiff asserts the District violated Section 33-205 by failing to provide him the opportunity to cross-examine the adult faculty members who produced written statements related to the incident.[1]

---

[1] The parties' briefing and materials submitted on the present motion raise factual issues that are improper for the Court to consider at this juncture—such as whether District Superintendent Pat Charlton instructed Plaintiff to take responsibility for the incident, and if so, what impact that had on Plaintiff's hearing testimony (Dkt. 23-2 at 5); or whether there are any facts supporting Plaintiff's contention that the District defamed Plaintiff. (Dkt. 23-2 at 6). The Court underscores the present posture of the case and the limited questions it has reviewed related to the motion for preliminary relief, as set forth more fully herein.

Plaintiff asserts that preliminary injunctive relief is necessary to prevent irreparable harm. Plaintiff argues the Court should issue an order with several components. First, order the District to lift the expulsion prior to June 1, 2018, so that Plaintiff can register for summer school at Ridgevue. Plaintiff contends he must attend summer school at Ridgevue, or another school in the area, to earn credits necessary to graduate on schedule—in May of 2019. Second, Plaintiff argues the Court should order the District to reenroll him with all privileges, including the privilege of playing interscholastic athletics, pending the outcome of this lawsuit. Plaintiff asserts this is necessary to prevent him from losing the opportunity to earn athletic scholarships. Although online courses may be available to Plaintiff through online learning academies, he asserts that some National Collegiate Athletic Association (NCAA) member universities or colleges do not recognize online credits when determining a student's eligibility to play sports. Alternatively, Plaintiff suggests the Court could instead order the District to lift the expulsion as to summer school and then, in short order, hold a new disciplinary hearing regarding Plaintiff's role in the incident to determine the appropriate punishment for the 2018 through 2019 regular school year. (Dkt. 4-1 at 12-13.)

## FACTUAL BACKGROUND

## I.    Incident Leading to Expulsion

When the events at issue occurred, Plaintiff was a junior at Ridgevue. He actively participated in interscholastic athletics as a member of the school's football, baseball, and wrestling teams. (Dkt. 4-1 at 2.) When he was expelled, Plaintiff had a 3.36 grade point

average and was enrolled in advanced placement classes in English and United States History. *Id.*

The incident that led to Plaintiff's expulsion occurred the morning of February 9, 2018, after weight training practice for the football team.[2] *Id.* Three students, including Plaintiff, left the school in a car to get food. (Dkt. 6-4 at 3.) During the trip, Plaintiff told the victim, J.M., who was sitting in the backseat to "shut up" several times. *Id.* J.M. is a smaller person than Plaintiff. (Dkt. 6-3 at 3.) When the students returned to the school, Plaintiff tackled or held J.M. so he could not exit the car. (Dkt. 6-4 at 3.) Plaintiff also admitted to pinching and hitting J.M. while he was in the car. (Dkt. 6-2 at 3.) Eventually, Plaintiff let J.M. go and the three boys made their way to the locker room to shower and change. *Id.*

Plaintiff was locked out for a short time by the other boys, who held the door to the locker room shut. *Id.* When Plaintiff was let in, he tackled J.M. to the floor. *Id.* While Plaintiff had him down, he jabbed or poked J.M.'s body several times with a key, including jabbing in or around the area of his rectum.[3] *Id.* This particular action was

---

[2] The factual background is based on the current record before the Court. Various accounts of the incident were provided by the participating or witnessing students. Although the students' recollections are similar in many regards, some factual disparities exist. These disparities do not impact the Court's ruling on the present motion, however, as its focus is on undisputed facts that: (1) Plaintiff and his mother were not provided witness statements prior to the hearings; and (2) the school did not produce the adult faculty members who provided statements at the hearings.

[3] Tom Dewitz, Head Football Coach, and Neil Stutzman, Head Basketball coach, talked with J.M. on February 12, 2018, three days after the incident. According to a report made by the coaches after the discussion, J.M. indicated Plaintiff was naked for some of the time the events in question occurred. (Dkt. 6-4 at 6.)

Affidavits provided by Defendant include a suggestion that the victim, J.M., is bringing or has brought criminal charges against Plaintiff for his actions on February 9.

described in the briefing and materials as an "oil check." *Id.* Although Plaintiff admits he jabbed J.M. with a key around the area of his buttocks or rectum, Plaintiff disputes that the key penetrated J.M.'s rectum. Plaintiff disputes also that he said the words –"oil check"– while jabbing J.M. with the key. Plaintiff states, instead, that he said J.M.'s "gas tank was empty." *Id.*; (Dkt. 6-2 at 2-3.)

J.M. eventually got up off the floor and ran out of the locker room. (Dkt. 6-4 at 4.) He returned, however, and Plaintiff tackled him again and, according to J.M., did another "oil check." *Id.* J.M. again got up and ran to another locker room and hid in a stall. *Id.* He stayed there until he thought "the coast was clear" and went back into the previous locker room to get his things. *Id.* However, Plaintiff was waiting for him, and proceeded to pour shampoo over J.M.'s head. *Id.* Plaintiff asserts that the fact that J.M. returned to the locker room twice demonstrates he consented to Plaintiff's actions and was participating in common locker room horseplay. (Dkt. 23-2 at 3, 5.)

One of the other three students took video of portions of these events with his cell phone. Plaintiff uploaded the video to Snapchat.[4] *Id.*; (Dkt. 6-4 at 13.) later than morning, Plaintiff approached Ryan Andreason, Assistant Football Coach, to show him the video. Coach Andreason told Plaintiff he had no interest in seeing the video but did relay information about his conversation with Plaintiff to Coach Tom Dewitz, Head Football Coach, over the weekend. (Dkt. 6-4 at 6.)

---

[4] The student who took the video stated that he deleted it from his phone the following Monday morning, February 12, 2018. (Dkt. 6-4 at 13.). The video is not part of the evidentiary record before the Court.

On Monday morning, February 12, Coach Dewitz had J.M. come to the office of Neil Stutzman, Head Basketball Coach, so Coach Dewitz could ask J.M. about what happened in the locker room. *Id.* J.M. related the events set forth above to both coaches. After the conversation, and because the information provided to the coaches was of concern, they alerted Ridgevue administrators and wrote a joint report detailing the conversation. *Id.* at 5-6.

In response to the information, according to District protocol, Ridgevue's Vice Principal, Jeremy Bergquist, pulled each involved student out of class that day to interview them and to take written statements. (Dkt. 26-1 at 2.) The students were separated and their cell phones were temporarily taken away to prevent collaborated responses. Ridgevue also obtained a statement from Coach Andreason regarding his conversation with Plaintiff about the Snapchat video. (Dkt. 6-4 at 8). In sum, the following statements or reports were taken: the joint report of the conversation with J.M., provided by Coaches Dewitz and Stutzman (Dkt. 6-4 at 5-6); the teacher/coach statement, provided by Coach Andreason; the victim statement, provided by J.M. (Dkt. 6-4 at 2-4); and three suspected offenders statements, provided by the two other involved students, and Plaintiff.[5] (Dkt. 6-4 at 9-15.)

Based on the information provided in the statements, Ridgevue administration referred Plaintiff to the District Disciplinary Review Committee (DDRC) for an out-of-school suspension hearing. The DDRC is a committee created by the District's Board of

---

[5] Plaintiff was allowed to call his mother, Ms. Wann, before proceeding with the interview. However, according to Vice Principal Bergquist, he chose not to do so. (Dkt. 26-1 at 2.)

Trustees to handle disciplinary matters. (Dkt. 19 at 5.) The hearing was set for the following day, February 13, 2018. (Dkt. 26-1 at 2-3.)

## II.     Notice and Hearings

Vice Principal Bergquist asserts he called Plaintiff's mother, Brenda Wann, three times on February 12, 2018, to notify her of the disciplinary proceeding and to discuss the investigation of the events of February 9. *Id.* Additionally, Julie Yamamoto, Principal of Ridgevue, drafted a letter to Ms. Wann, providing notice that the incident had been referred to the DDRC and that a hearing would be held the next day. In addition to the letter, Ms. Wann was provided with a Behavior Detail Report (Report), which is a file that documents any disciplinary event related to a particular student. The Report was updated to include a summary of the facts related to the charges against Plaintiff from the February 9 incident.  In addition to the Report, Ms. Wann was provided a copy of the school policies at issue, Plaintiff's grades, and his attendance history. (Dkt. 19 at 13.) Ms. Wann picked up the letter and additional documents from Ridgevue's administration office the morning of February 13, 2018. (Dkt. 20-1 at 1-3.)

The basis for the disciplinary hearing was described in the letter as "the sexual harassment and bullying/intimidation" of another student at the school. (Dkt. 6-1 at 1.) The letter detailed that Ms. Wann could request a continuance should the hearing date not provide a reasonable period to prepare. *Id.* Further, the letter set forth that Ms. Wann had the following rights during the hearing process: (1) the right to be represented by legal counsel; (2) the right to produce witnesses and submit evidence on [Plaintiff's] behalf;

and (3) the right to cross-examine any adult witness who may appear against [Plaintiff]. *Id.*

i.      *District Disciplinary Review Committee Hearing – February 13, 2018*

At the February 13, 2018 DDRC hearing, Ms. Wann acknowledged that she received advanced notice of the hearing, that she was notified of her son's disciplinary offenses, and that she understood she had the right to ask questions and ask for clarification throughout the hearing process. (Dkt. 6-2 at 2.) Ms. Wann affirmed also that there was no reason to postpone the hearing for her to be better prepared. *Id.* The following Behavior Detail Report was then read aloud by Vice Principle Bergquist to Ms. Wann, Plaintiff, and all other members of the DDRC:

**Incident Details:** 4 students (BW, MS, JM, KB) were in the locker room/parking lot area on 2.9.18 before school (after football workouts). KB was never in the parking lot. JM, MS and BW were in BW's vehicle after getting some food. JM and BW were having words back and forth and BW became physical with JM. JM is much smaller than BW/MS. Both BW and MS were reported to have been physically pinning down and punching JM (in the arm) repeatedly in the vehicle. The three students then proceeded to the locker room area and KB let them in the door. BW was locked out at this time and eventually let back in. When BW came into the locker room, he continued to be physically aggressive towards MS and JM. Statements were made that BW was messing around and [*sic*] may be typical of his behavior.

Eventually BW tackled JM down to the ground and continued to pin him down, using his key and jabbing in [*sic*] in various parts of the body. BW eventually probed JM in the buttocks where it has been reported that the key penetrated his rectum. At this point, BW or MS referred to the event as an "oil check." Victim reports multiple incidents of penetration with the key. JM got up and ran out of the locker room. MS was recording the incident and send [*sic*] the footage to BW. KB was a witness. Moments later, after the students had taken a shower, BW went over to JM in the PE locker room and poured shampoo on his head.

Later that day the incident was on Snapchat and available for others to see. Victim stated that he saw the video on BW's phone.

(Dkt. 6-3 at 3.)

Plaintiff and Ms. Wann were asked if the Report[6] was accurate. Plaintiff disputed two facts: that the key penetrated J.M.'s rectum, and that he said, "oil check." (Dkt. 6-2 at 2). He instead stated he said J.M.'s "gas tank was empty." *Id.* However, Plaintiff and Ms. Wann agreed that all other portions of the Report were accurate. The committee then asked Plaintiff to provide his own account of what happened. *Id.* at 3. Thereafter, he was questioned by members of the committee regarding particular details and asked whether he understood the impact of his actions. Plaintiff stated that he took full responsibility and that he would likely be scared if something similar happened to him. *Id.* Ms. Wann next gave a statement regarding her son's good character at home, within his school, and the community. *Id.* at 5. She also read a statement written by a Ridgevue staff member about Plaintiff's leadership qualities. *Id.*

The DDRC decided to refer Plaintiff's case for a full expulsion hearing before the District's Administrative Review Team (DART), and set the hearing for February 20, 2018. The DDRC announced that Plaintiff remained on temporary out-of-school suspension until the expulsion hearing.

---

[6] Prior to the hearing, the DDRC members were provided with the written statements of the coaches and the students. The written statements were collected before the hearing and were not available to the members later, during their deliberations. (Dkt. 28 at 3 ¶ 4.) The statements were not included in the DDRC packet received by Plaintiff and Ms. Wann.

ii.     *District Administrative Review Team Hearing – February 20, 2018*

At the February 20, 2018 DART hearing, Ms. Wann answered affirmatively when asked if she had received notice of the hearing, if she was notified of her son's disciplinary offenses, and if she understood the rights to ask questions and ask for clarification. (Dkt. 6-2 at 6.) She affirmed also that she was prepared for the hearing and there was no reason to postpone it on that basis. *Id.*

The principal of Ridgevue, Ms. Yamamoto, then provided a packet to Ms. Wann, stating it was the same as the packet of documents provided prior to the DDRC hearing.[7] Ms. Yamamoto read aloud the same Behavior Detail Report read previously by Vice Principal Bergquist at the DDRC hearing. The hearing officer asked if everything in the report was correct. Plaintiff denied that the key penetrated J.M.'s rectum, yet admitted that he did jab J.M. with the key, and stated that he took full responsibility for his actions. Committee members asked Plaintiff additional questions, and Ms. Wann provided another statement regarding her son's character and his plans to make amends within the school and the community. Ms. Wann then read a statement posted on Facebook in 2017 by a Ridgevue staff member and an email from Coach Dewitz—both providing praise of Plaintiff.  Finally, prior to deliberations, the hearing officer asked if Plaintiff or Ms. Wann had anything further to provide. Plaintiff stated: "I own what I did. I'm sorry. I hope to return to Ridgevue and earn my teammates' trust back." (Dkt. 6-2 at 9.)

---

[7] As with the DDRC hearing, prior to the DART hearing, members of the committee were provided with the written statements of the coaches and the students. The written statements were collected before the hearing and were not available to the members later, during their deliberations. (Dkt. 28 at 3 ¶ 4.)

After deliberation, the DART announced their decision to expel Plaintiff for one calendar year—until February 20, 2019. *Id.* Ms. Wann was provided with a one-page printed Unofficial Hearing Results Summary at the conclusion of the hearing. (Dkt. 23-1 at 6.) The summary indicated that formal notice of the results would be mailed, but also included notice of the right to appeal the decision with the superintendent within five business days.[8] Ms. Wann acknowledged receipt of the summary and attached the same to her reply declaration in support of the present motion. (Dkt. 23-1 at 3; 6).

### iii.    *Notice of Rights to Appeal*

Despite acknowledging receipt of the summary, Ms. Wann asserts she was not notified of the right to appeal the DART decision until March 12, 2018. (Dkt. 23-1 at 3.) On that date, an attorney retained by Ms. Wann contacted the District on Plaintiff's behalf to request a hearing for *de novo* review of the expulsion decision. As a result of the contact, the attorney was provided with a letter from the District dated February 23, 2018, and addressed to Ms. Wann. The letter provided formal notice of Plaintiff's expulsion, and included notice that Plaintiff or Ms. Wann had the right to appeal the Administrative Review Team's decision with the Vallivue Board of Trustees within five business days. (Dkt. 6-2 at 1.)

---

[8] Notice as it appears on Unofficial Hearing Results Summary. (Dkt. 23-1 at 6.)

The District Discipline Review Committee decision will be implemented immediately, but you have the right to appeal the decision with the superintendent within five business days. If you elect to waive your right to appeal at this time, the decision will become effective immediately. If you choose to appeal, the superintendent will implement an additional suspension and arrange a Superintendent Review Hearing as soon as possible, preferably within five days.

According to Plaintiff, the March 12, 2018 request for a *de novo* review of the
DART decision was initially granted by the District, a hearing was set for April 3, 2018,
and later rescheduled for April 10, 2018. (Dkt. 1 at 9.) Additionally, according to the
District, on or around March 19, 2018, District Superintendent Pat Charlton spoke with
Plaintiff's attorney and offered Plaintiff the option of taking online classes through the
District's alternative school program. He offered also that Plaintiff could attend Saturday
help sessions for his classes. (Dkt. 19 at 7.) Plaintiff declined the offers. On April 10,
2018, the District cancelled the *de novo* review hearing scheduled for that day based on
the untimeliness of Plaintiff's request under the appeal rules. *Id.*

## STANDARDS OF REVIEW

### 1.    Preliminary Injunctive Relief

Preliminary injunctions and temporary restraining orders are governed by Federal
Rule of Civil Procedure 65— the analysis required for each type of preliminary relief is
"substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832,
839 n.7 (9th Cir. 2001). Preliminary injunctive relief is treated as an extraordinary
remedy never awarded as of right. *Winter v. Natural Resources Defense Council, Inc.*,
129 S. Ct. 365, 376 (2008). A plaintiff seeking preliminary injunctive relief must
establish (1) likelihood of success on the merits; (2) likelihood of suffering irreparable
harm in the absence of preliminary injunctive relief; (3) that the balance of equities is in
plaintiff's favor; and (4)  that the injunction is in the public interest. *Id*. Further, the
plaintiff must show irreparable harm is likely, and not a just a possibility. *Id*. A court

must consider each factor and balance the parties' competing claims of injury by considering the effect the injunction would have on each party.

Issuance of preliminary relief is favored when the merits analysis and hardship balance both tip strongly toward the plaintiff, so long as the plaintiff shows also that there is "a likelihood of irreparable injury and that the injunction is in the *public* interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). This "sliding scale approach" allows a party to make a lesser showing of likelihood of success provided he will suffer substantial harm in the absence of relief. *Id.* at 1133. Under this approach, however, "serious questions going to the merits" requires more than showing that "success is more likely than not;" it requires a plaintiff to demonstrate a "substantial case for relief on the merits." *See Wildearth Guardians v. Mark*, WL 6842771, at *2 (D. Idaho 2013) (quoting *Leiva–Perez v. Holder*, 640 F.3d 962, 967–68 (9th Cir. 2011)).

**2.     Procedural Due Process – Public Schools**

The Due Process Clause of the Fourteenth Amendment "forbids arbitrary deprivations of liberty." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). In *Goss,* the Supreme Court of the United States found public school students have a property interest in their public education. *Goss v. Lopez*, 419 U.S. 565, 574 (1975). Thus, the Due Process Clause, as applied to the States, protects such interest. *Id.*; *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943) (the Due Process Clause "protects the citizen against the State itself and all of its creatures—Boards of Education not excepted.") .

States do, however, have broad authority and discretion to create and enforce standards of conduct in schools. *Goss* at 574. Yet, the authority is subject to constitutional safeguards, including the State's recognition of students' entitlement to a public education as a property interest protected by the Due Process Clause. *Id*. Given this, the State may not take away a student's property interest without meeting the requirements of due process. *Id.*

The process required varies based on the length of the suspension or expulsion. *Id.* Due process required for suspensions of ten days or less is minimal: the student must be given oral or written notice of the charges and an opportunity to present his or her version to authorities—preferably prior to removal from school—unless prior notice and hearing are not feasible. *Id.* In those cases, the student should be given notice of the hearing as soon as practicable. *Id.* Suspensions or expulsions longer than ten days in duration, like the one-year expulsion in this case, may require more formal process than that set forth by the Supreme Court in *Goss*. *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1073 (9th Cir. 2013). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976).

Neither the Supreme Court nor the Ninth Circuit Court of Appeals has mandated specific procedures for lengthier suspensions.[9] Yet, in *Wynar*, the Ninth Circuit set forth a

---

[9] Plaintiff relies on a Ninth Circuit Court of Appeals decision to advance the argument that for long expulsions or suspensions, a student must be given any evidence against him in advance of the hearing, and be must given the right to cross examine witnesses who have provided written statements to the school district (citing *Black Coal. v. Portland School District No. 1*, 484 F.2d 1040 (9th Cir. 1973). (Dkt. 23 at 4-5.) In *Black Coal.*, the Ninth Circuit held that a school district's procedures for long term or indefinite expulsions must allow for a hearing where a student can be "represented by counsel, and

framework that it applied to a suspension of ninety days. *Wynar* at 1073. To determine whether the suspended student received adequate due process, the Ninth Circuit considered the following: (1) the student's interest in attending the school he had been suspended or expelled from; (2) the risk of erroneous deprivation of the interest through the procedures used; (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the school district's interest, including any significant burdens the additional procedural safeguards would entail. The Ninth Circuit noted, however, that a school district's administrative proceedings do not need to "cleave to strict state evidentiary rules," *Id.* at 1073; (quoting *In re Estate of Covington,* 450 F.3d 917, 923 (9th Cir.2006)).

Additionally, although neither the Supreme Court of the United States nor the Ninth Circuit Court of Appeals has directly addressed the question of whether participation by a student in interscholastic athletics constitutes a property interest, the majority of federal courts that have considered the question have found no such interest. *See, e.g., Denis J. O'Connell High Sch. v. Virginia High Sch.* 581 F.2d 81, 84 (4th Cir.1978); *Moreland v. Western Pa. Interscholastic, Etc.* 572 F.2d 121, 123–124 (3rd Cir.1978); *Hamilton v. Tenn. Secondary Sch. Athletic Ass'n.* 552 F.2d 681, 682 (6th Cir.1976); *Albach v. Odle* 531 F.2d 983, 984–985 (10th Cir.1976); *Mitchell v. Louisiana High School Athletic Ass'n* 430 F.2d 1155, 1157–1158 (5th Cir.1970).

---

through counsel, present witnesses on his own behalf, and crossexamine adverse witnesses." *Black Coal.* at 1045. Thus, the holding does not support Plaintiff's argument that the District denied him due process by failing to provide additional procedures—i.e. when it did not provide him the witness statements in advance of the hearings, and when it did not produce the coaches as witnesses at the hearings.

Federal district courts within the Ninth Circuit have reached the same conclusion. "An entitlement, like the state right to a free public education, does not necessarily create a property interest in each of its constituent parts." *Ryan v. California Interscholastic Fed'n-San Diego Section*, 114 Cal. Rptr. 2d 798, 811 (2001). In other words, "participation in interscholastic athletics, standing alone, is but one stick in the bundle of the educational process and does not rise to the level of a separate property […] interest to which a student is entitled and of which he or she cannot be deprived without due process." *Id.* at 810; *See Kanongata'a v. Washington Interscholastic Activities Ass'n*, WL 1727891, at *23 (W.D. Wash. June 20, 2006) (there is no property right in interscholastic high school athletic participation).

## A. *Idaho Code Section 33-205*

Idaho law provides discretion to the board of trustees of each school district to deny enrollment or attendance at any of Idaho's public schools by expelling any student who: (1) is a habitual truant; (3) is incorrigible; (3) is continuously disruptive of school discipline; (4) is continuously disruptive of the instructional effectiveness of the school; (5) whose presence in the school is detrimental to the health and safety of other students; or (6) who has been expelled from another school district in Idaho or any other state. Idaho Code § 33-205.

A student cannot be expelled unless the board of trustees has provided written notice to the parent or guardian of the student stating the grounds for the proposed expulsion, and the time and place where the parent or guardian can appear to contest the action. *Id.* The notice must state the rights of the student to be represented by an attorney,

to produce witnesses and evidence on his or her own behalf, and to cross-examine adult witnesses who *may* appear against him or her. *Id.* After the notice has been effected, the board is required to hold a full and fair hearing on the proposed expulsion. *Id.*

"It is into the hands of the school board, elected by local citizenry, not the courts, that the legislature has placed the discretionary power to discipline and expel students." *Rogers v. Gooding Pub. Joint Sch. Dist. No.* 231, 20 P.3d 16 (2001), *overruled, on the issue of attorney's fees only*, by *City of Osburn v. Randel*, 277 P.3d 353 (2012). The Idaho Supreme Court has cautioned that only "with great reluctance" should courts become involved in conflicts presented in the operation of public school systems. *Id.* Yet, when the actions of a school system implicate basic constitutional values, it is appropriate for a court to become involved. *Id.* (citing *Epperson v. Arkansas*, 393 U.S. 97 (1968)).

As set forth in Idaho Code Section 33-205, notice and hearing are required before a student can be expelled from school. However, the procedures involved within that context "need not be as exacting as those found in criminal or juvenile [court] systems." *Rogers* at 20. "In school disciplinary proceedings, notice as to the facts of the charge is generally sufficient." *Id.*

## ANALYSIS

As explained more fully below, the Court finds Plaintiff has failed to meet the high burden of showing likelihood of success on the merits of any of his three due process based claims—when considering his contentions within the federal due process framework and Idaho Code Section 33-205. Additionally, the balance of hardships tips in favor of the District, and the public interest does not favor an injunction. Furthermore,

even if the Court were to employ the sliding scale approach, the requirements for issuance of preliminary injunctive relief are not met: Plaintiff has failed present a substantial case for relief within the record presently before the Court.

## 1.      Likelihood of Success on the Merits

Each of Plaintiff's claims alleges a violation of procedural due process, either under the Fourteenth Amendment to the United States Constitution, or under Idaho Code Section 33-205. As set forth above, due process, in connection with public school disciplinary actions, is flexible—it calls for the procedural safeguards as the situation demands. Because Plaintiff's expulsion exceeded the ten-day suspensions at issue in *Goss*, something more than simple notice and an opportunity to respond was required. Thus, the Court will analyze the merits of Plaintiff's federal claims according to the four factors for lengthier suspensions set forth and discussed by the Ninth Circuit in *Wynar*. The factors are: (1) Plaintiff's interest in attending Ridgevue; (2) the risk of erroneous deprivation of the interest through the procedures used; (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the District's interest, including any significant burdens the additional procedural safeguards would entail.

### A.      *Plaintiff's Interest in Attending Ridgevue*

Plaintiff was in his junior year when expelled—thus the District's decision does have significant impact on him because he was near to finishing his high school education. The Court does not doubt that changing schools at this juncture would be disruptive. Further, although Plaintiff has no separately recognized property interest in participation in interscholastic athletics, including football—as discussed further below—

the loss of the opportunity is still notable in the context of Plaintiff's particular interest in attending Ridgevue and re-joining his previous team. However, Plaintiff's interest in attending Ridgevue, specifically, is minimized by the fact that he likely can earn credits toward graduation during the term of his expulsion by virtually attending accredited online learning academies.

**B.**     ***Risk of Erroneous Deprivation through Procedures Used***

Second, the Court considers the risk of erroneous deprivation of the recognized property interest through the procedures used by the District. The District held two hearings on the issue of Plaintiff's potential expulsion. Prior to the first hearing, Plaintiff's mother received a letter detailing the reason for the hearing, the charges Plaintiff faced, her right, and thus Plaintiff's right, to be represented by an attorney at the hearing, and her right to request a new hearing date should she need more time to prepare.

At both hearings, the Behavior Detail Report was read aloud. Although the Report may have been based on the statements of others who did not testify at the hearing—involved students, the victim, and the coaches—Plaintiff and his mother were given an opportunity at each hearing to contest the information in the Report. Plaintiff was also given the opportunity at each hearing to explain his version of the events and to add anything he wanted the committee to know.

Although Plaintiff argues more was required, pursuant to both Ninth Circuit case law and Idaho case law, the District was not mandated to follow the evidentiary strictures related to the introduction and consideration of evidence that are required in courts of

law. *See Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062 (9th Cir. 2013); *See also Rogers v. Gooding Pub. Joint Sch. Dist. No.* 231, 20 P.3d 16 (2001). Thus, by providing Plaintiff the opportunity to refute the information, the opportunity to present additional or different evidence through his testimony, or the statements of other testifying witnesses, the District likely provided adequate process. Notably, Ms. Wann affirmed she understood her rights at the outset of the second hearing. (Dkt. 6-2 at 6.) She was provided also written notice of the appeal rights via the Unofficial Hearing Results Summary she received at the end of the hearing. Therefore, Plaintiff has failed to demonstrate a likelihood of substantial risk that Plaintiff was erroneously deprived of his recognized property interest in education because of the procedures used by the District.

### C.     *Probable Value of Additional or Substitute Procedures*

Next, the Court must consider the probable value, if any, of additional or substitute procedural safeguards. Plaintiff contends the District had an obligation to produce as witnesses the adult coaches who provided statements related to the incident, and was required also to provide him with their statements and the statements of the victim and other involved students prior to the hearings.

The Ninth Circuit in *Wynar* was presented with a similar argument. There, the student asserted that his due process rights were violated because he was not provided specific evidence, like the witness statements in this case, before the expulsion or suspension hearing. *Wynar*, 728 F.3d 1062, 1073 (9th Cir. 2013). The student argued also that, because no witnesses testified to the specific issue of his potential disruption of school activities, he was not afforded the opportunity to cross-examine witnesses or

evidence on that point. *Id.* However, the Ninth Circuit found the additional procedures conceived by the student were not constitutionally required, because he had the key evidence—in that case, the messages he had written to fellow students on MySpace. *Id.* Further, the court found the school district was not obligated to produce witnesses to testify regarding the student's potential to disrupt school activities. The Ninth Circuit found the student's objection to the school district's consideration of the evidence, without calling a witness to testify to the likelihood of disruption, was an objection going to the weight given to the evidence, and did not implicate a due process concern. *Id.*

Here, like the student in *Wynar*, Plaintiff contends the District should have provided him with the evidence used to create the Behavior Detail Report. Specifically, that he should have been provided the statements from other involved students and the coaches. Plaintiff asserts that, had he been in possession of the statements prior to the hearings, he would have realized it was important to make it clear that performing an "oil check" is a common joke among the members of Ridgevue's football team. He contends he would have clarified also that J.M. consented to his actions that day because J.M. returned to the locker room twice—it was all a joke.

Yet, the District would not need to "discredit [Plaintiff's] insistence that he was joking." *Wynar*, 728 F.3d 1062, 1071 (9th Cir. 2013). It was reasonable for the District "to proceed as though he was not" joking, because of the District's mandate to ensure for the safety of all students. *Id.* Significantly, when Plaintiff was questioned at the hearings, he acknowledged his actions were likely assault (Dkt. 6-2 at 3), and that if a person

watched the video of the incident objectively, it would be apparent J.M. was uncomfortable when Plaintiff started poking him with the key. *Id.* at 7.

Furthermore, like in *Wynar*, this scenario creates a potential evidentiary issue and not a due process violation in the context of the District's disciplinary hearings. Like the student in *Wynar*, Plaintiff was in possession of all the key evidence in advance of each hearing. For example, Plaintiff knew: (1) he was being charged with violations of the school's harassment, intimidation, and bullying policy, as well as the policy against sexual harassment; (2) the exact nature of the activity in question because he played a significant part in the events; (3) the identities of the other students who were present during the time of the incident; (4) after the first hearing, that the school was aware he attempted to show the video to Coach Andreason, and thus had likely at least spoken with him about it; and (5) after the first hearing, that the District was concerned about the effect the incident had on J.M. and was concerned about the health and safety of all students.

Additionally, within the context of the hearings, Plaintiff was provided an opportunity to refute the specific information set forth in the Behavior Detail Report, his mother read statements to the committees on his behalf, and both were aware of his right to call witnesses. As stated above, although the Report may have been based on the statements of others who did not testify at the hearing— involved students, the victim, and the coaches—Plaintiff and his mother were given an opportunity at each hearing to contest the information in the Report. For these reasons, Plaintiff has failed to demonstrate a likelihood that the Court would find the District was constitutionally

required to provide him with the written statements prior to the hearings, or that the District was required to call the students or coaches who wrote statements.

### D. *The District's Interest and Potential Additional Burdens*

Finally, the Court must consider the District's interest, including any significant burdens the additional procedural safeguards would entail. Although producing the coaches as witnesses would not have created significant burden, providing the statements given by the victim and other minor students could create additional potential legal implications for the District. Providing the statements of other minor students directly to Plaintiff and his mother would create potential confidentiality issues. Further, it was not necessary, because, as set forth above, Plaintiff and his mother were notified in advance of the nature of and reasons for the charges against him, and Plaintiff knew the identities of each of the other students who were present during the incident. As the Ninth Circuit aptly noted in *Wynar*, a school district's administrative proceedings need not "cleave to strict state evidentiary rules."

### E. *Requirements of Idaho Code Section 33-205*

Plaintiff has failed also to meet the high burden of showing likelihood of success regarding his claim that the District violated Idaho Code Section 33-205 when it did not produce adult faculty members –Coaches Dewitz, Stuzman, and Andreason– as witnesses at the hearings. Idaho Code Section 33-205 provides that the District must provide the opportunity to cross-examine witnesses who *may* appear against a student. None of the coaches appeared and testified against Plaintiff at either hearing. Plaintiff fails to cite even one authority that supports his contention that a school district must produce as

witnesses any faculty member who supplied information, even in the form of a written statement, upon which its decision was based or partially based.

The record presently before the Court shows the District met each of the requirements of the Code because it: provided written notice to Plaintiff's mother stating the grounds for the proposed expulsion; it provided the time and place where Ms. Wann could appear and contest the action; and, it stated the rights of Plaintiff to be represented by an attorney, to produce witnesses and evidence his behalf, and to cross-examine witnesses.

**2.      Likelihood of Irreparable Harm**

Plaintiff is unlikely to suffer irreparable harm if he is unable to physically attend Ridgevue because he has the option of taking online classes until he is eligible for reinstatement in February of 2019. Plaintiff alleges he has suffered harm and will continue to suffer harm unless the Court issues a preliminary injunction, lifting the expulsion, and allowing him to register for summer school during the pendency of this lawsuit. Yet, if he is able to take online classes, this harm is not only unlikely, it does not exist.

Additionally, Plaintiff asserts he will be irreparably harmed if the school is not ordered to reenroll him with all rights and privileges so that he can rejoin the football team for his senior year. Plaintiff asserts he will lose the opportunity to earn potential football scholarships because NCAA member schools do not always accept online classes when considering a student athlete's eligibility. Plaintiff asserts he has been approached by Eastern Oregon University and the College of Idaho to play football. (Plaintiff's

Declaration in Support of Motion for Preliminary Injunction and Temporary Restraining Order, Dkt. 23-2 at 7 ¶ 27.) He asserts further that both institutions discussed giving him athletic scholarships for football. *Id.* However, District Superintendent Pat Charlton indicated that in his general familiarity with the NCAA's rules, online classes taken through accredited institutions are acceptable to the NCAA. (Second Declaration of Pat Charlton in Support of Defendant's Response, Dkt. 27 at 2 ¶ 5.) Moreover, Plaintiff's potential to be offered scholarships to play football at a college level, whether for an NCAA member school or a school in a different athletic conference, is, at this juncture, speculative in nature.

More significantly, Plaintiff's interest in playing football has not been recognized by either the Ninth Circuit or the Supreme Court as a singular property interest protected by the Due Process Clause. As affirmed by numerous courts, such interest does not by itself rise to the level of a separate property interest. *See Ryan v. California Interscholastic Fed'n-San Diego Section*, 114 Cal. Rptr. 2d 798 (2001). Thus, Plaintiff's interest in continuing to play football cannot and does not stand on its own to require a separate due process analysis.

### 3.  Balance of Equities

With regard to balancing the equities, Plaintiff asserts the hardships imposed on the District by conducting a more thorough, reliable fact-finding and evidentiary hearing are minimal when compared with the consequences of the expulsion for himself. Plaintiff asserts the expulsion affects his reputation, his collegiate education, and future employment opportunities.

The District's hardships relate to its responsibility for ensuring a safe environment for all students. It contends that readmitting Plaintiff to the school in the fall would cause it difficulty in its efforts to protect the health and morals of all students, as required by Idaho Code Section 33-512(4).[10] The victim in this case, J.M., is purportedly traumatized by the events that took place on February 9, 2018. The District asserts it must weigh Plaintiff's interest in his education with the health and safety of its other students—because of this, the District argues its mandates are better served by Plaintiff remaining off campus and taking online classes.

Given the responsibility the District has to maintain an environment that is safe for all students, and the options Plaintiff has to catch up via online classes, and, potentially enroll in another high school for his senior year, the balance of the equities tips in favor of the District.

### 4. Public Interest

Considering the public interest in a case related to school discipline is significant. Plaintiff asserts it is in the public interest that the school not wrongfully deny him an education because he, like all citizens of the state, has a constitutional right to receive an education—which in collective provides "the stability of a republican form of government." (Dkt. 4-1 at 15.)

Yet education has little value if students are in an environment where learning is compromised by unsafe conditions. Like Ridgevue, many schools have instituted "no

---

[10] GOVERNANCE OF SCHOOLS. The board of trustees of each school district shall have the following powers and duties: (4) To protect the morals and health of the pupils. I.C. § 33-512.

tolerance" policies for harassment, intimidation, and bullying. Ridgevue's policy clearly states that disciplinary action may include expulsion. (Dkt. 17-3 at 1). The District provides each student and their parent or guardian annual written notice of the policy. *Id.* at 2. It is also published in the student handbook. *Id.*

In turn, as argued by Plaintiff, the public has great interest in the District fairly maintaining and enforcing these policies. Yet, as explained above, the District likely provided the process due given the situation at hand. Issuing an injunction in this matter would insert the Court into an area of discretion expressly reserved for school boards for each district by the Idaho Legislature—the power to discipline and expel students. As such, and for the reasons stated more fully above regarding the balance of equities, the public interest does not favor granting preliminary injunctive relief.

Finally, because there are serious questions regarding the merits of Plaintiff's claims, the Ninth Circuit's "sliding scale approach" could potentially apply if the Court determined he will suffer substantial harm in the absence of relief. Under this approach, however, Plaintiff must demonstrate a substantial case for relief on the merits. Because the potential of irreparable harm is slight, due to Plaintiff's alternative options for finishing his education on time, this approach would also likely not support the issuance of preliminary injunctive relief.

## CONCLUSION

Plaintiff failed to establish a likelihood of irreparable harm in the absence of preliminary injunctive relief. He failed also to meet the high burden of establishing likelihood of success on any of his due process-based claims. Additionally, the balance of

the hardships tips in favor of the District due to its mandate to ensure the health and safety of all students. And public interest does not favor an injunction, given the District's mandate, and the discretion provided to school boards to determine disciplinary policy and procedures. In sum, under this factual record, issuance of preliminary injunctive, as an extraordinary remedy, is not warranted.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)  Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 4) is **DENIED**.

DATED: May 31, 2018

Candy W. Dale
U.S. Magistrate Judge